WILKINSON, Circuit Judge,
concurring:
I concur fully in Judge Motz’s fíne opinion. It demonstrates well the central flaws in the plaintiffs’ contentions.
A few additional observations may underscore the overblown nature of this case. Plaintiffs have sought to raise every experimental claim and to corral every conceivable defendant. The result is a case on the far limbs of law and one destined, were it to succeed in whole, to spread damage in all directions.
I.
Although I appreciate the able and well-intentioned efforts of the attorneys in this matter, there is something disquieting about the sweeping scope and number of claims brought by the various plaintiff groups (twenty-three counts in the Evans complaint, thirty-two in Carrington, and forty in McFadyen), as well as the glacial pace at which this litigation has proceeded (we are now nearly six years removed from the dismissal of the last charges against the three Duke lacrosse players). With all of these overwrought claims disputed over years of complex litigation, this matter has taken on an unfortunate life of its own. A few examples of the pitfalls in plaintiffs’ most inventive claims illustrate my concerns with allowing them to proceed.
A.
To take one example, the complaints lodge a Fourteenth Amendment “due process stigma-plus” claim against Corporal David Addison, the Durham Police spokesman. In seeking to hold Addison liable for allegedly defamatory statements, the complaints fly in the face of the Supreme Court’s admonition that the Due Process Clause is not to be converted into “a font of tort law to be superimposed upon whatever systems may already be administered by the states.” Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Yet plaintiffs seek that result and then some, attempting to hold a police spokesman liable for general statements that reference no individual and are'therefore not even actionable under traditional defamation law. See Restatement (Second) of Torts § 564A (1977) (“One who publishes defamatory matter concerning a *660 group or class of persons is subject to liability to an individual member of it if, but only if, (a) the group or class is so small that the matter can reasonably be understood to refer to the member, or (b) the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member.”).
Moreover, the plaintiffs’ position would expose spokespersons (who are often given limited information by their superiors on a need-to-know basis) to the threat of monetary damages for expressing a departmental position in the most general of terms. Think of the implications of such a rule for public spokespersons of all sorts, from the press secretary for the Department of State to the spokesperson for a local school board. The threat posed by litigation of this kind would cause such officials to clam up, and the criminal justice system — not to mention government generally — would become less transparent than it already is.
The plaintiffs’ “stigma-plus” claim against Addison suffers from another shortcoming. Even if Addison’s general statements could somehow be considered defamatory with respect to the various individual plaintiffs, the complaints fail to plausibly allege that any of his statements caused the indictments of Evans, Finnerty, and Seligmann, much less the issuance of the NTO or McFadyen search warrant. See Johnson v. Morris, 903 F.2d 996, 999 (4th Cir.1990) (“[F]or a liberty interest to have been implicated, some damage to [plaintiffs] employment status must have resulted from publication of the reasons for his demotion.” (emphasis added)); see also Rehberg v. Paulk, 611 F.3d 828, 853 (11th Cir.2010) (dismissing a stigma-plus claim where the complaint did not allege that the defendant’s media statements “caused” the plaintiffs indictments and arrest), aff'd on other grounds, — U.S. -, 132 S.Ct. 1497, 182 L.Ed.2d 593 (2012).
Indeed, it is difficult to imagine how the public statements of a spokesperson about the status of a rape investigation could be causally related to a police investigator’s decision to seek evidence or a prosecutor’s decision to pursue an indictment. The Evans plaintiffs argue that a causal connection may be inferred from their allegation that Addison’s statements were “intended to inflame the Durham community and grand jury pool against the plaintiffs.” But such an intent, even if taken as true, is far too removed from the prosecutor’s decision to indict and the investigators’ decision to seek the NTO to justify imposition of monetary liability on the basis of a defamation claim that is dubious enough under common law and that the Supreme Court was deeply reluctant to constitution-alize in the first place.
B.
A second example of the complaints’ overreach lies not so much in the nature of the claims as in the identity of the defendants. The plaintiffs have sued not just the police investigators, but also a number of Durham city officials such as the City Manager, Chief of Police, and various members of the police chain of command. Plaintiffs seek monetary damages from these so-called “supervisory defendants” under a theory of supervisory liability. In Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), however, the Supreme Court issued several cautionary holdings with respect to such liability— lessons that plaintiffs have utterly failed to heed.
To begin with, the Supreme Court explained in Iqbal that “a supervisor’s mere knowledge” that his subordinates are engaged in unconstitutional conduct is insufficient to give rise to liability; instead, a *661 supervisor can be held liable only for “his or her own misconduct.” Id. at 677, 129 S.Ct. 1937. Yet the complaints in this case repeatedly allege that the so-called supervisory defendants violated plaintiffs’ constitutional rights on the theory that they “knew or should have known” about their subordinates’ conduct. This directly contradicts Iqbal’s holding that such allegations, standing alone, cannot give rise to supervisory liability.
Moreover, the Iqbal Court explained that in order to state a claim for supervisory liability, “a plaintiff must plead that each [supervisory] defendant, through the official’s own individual actions, has violated the Constitution.” Id. at 676, 129 S.Ct. 1937 (emphases added); see also Robbins v. Oklahoma, 519 F.3d 1242, 1250, 1252-53 (10th Cir.2008) (dismissing supervisory liability claim where complaint failed to “isolate the allegedly unconstitutional acts of each defendant”). The plaintiffs here, however, have roped in a number of Durham city officials without pleading any allegedly improper individual actions. For example, apart from general references to name, rank, and place in the chain of command, the Evans complaint does not contain so much as a single individualized allegation against named defendants Beverly Council and Lee Russ. The Carrington complaint likewise fails to make particularized allegations against Council, Russ, and Michael Ripberger. The absence of individualized allegations is all the more remarkable in light of the otherwise exhaustive nature of the complaints: combined, the three complaints weigh in at a staggering eight hundred-plus pages.
The plaintiffs argue that the absence of specific allegations with respect to each individual supervisor is of no consequence given that they have used the term “supervisory defendants” as shorthand to allege the collective actions and state of mind for all of the named supervisors. Requiring repetition of the names of specific defendants within the context of each factual allegation, we are told, would be “pointless and inefficient.” This contention sorely misses the mark. The purpose of requiring a plaintiff to identify how “each [supervisory] defendant, through the official’s own individual actions, has violated the Constitution,” Iqbal, 556 U.S. at 676, 129 S.Ct. 1937 (emphases added), is not to erect some formalistic rule that a complaint must mention each defendant by name some particular number of times. The requirement is instead designed to ensure that the serious burdens of defending against this sort of lawsuit are visited upon a departmental supervisor only when the complaint “plausibly suggests]” that the supervisor engaged in “his or her own misconduct.” Id. at 681, 677, 129 S.Ct. 1937 (emphasis added).
That showing is demonstrably absent here. In addition to the complaints’ failure to identify specific misconduct on the part of certain individual defendants, there are numerous problems with the individualized allegations that are actually made. For instance, both the Carrington and McFadyen complaints discuss at length a meeting occurring on or around March 29, 2006, allegedly attended by specific supervisory defendants (Patrick Baker and Steven Chalmers in the Carrington complaint; Baker, Russ, and Ronald Hodge in the McFadyen complaint) where the prosecutor and investigators allegedly agreed or were instructed to expedite the case against the Duke players despite mounting evidence of their innocence. But that meeting has no logical relevance to the supposed Fourth Amendment violations of which these plaintiffs complain because it occurred days after the preparation of the allegedly false NTO and McFadyen search warrant applications. In other words, to *662 use the language of Iqbal, the plaintiffs’ allegations regarding this meeting do not “plausibly give rise to an entitlement to relief.” Id. at 679, 129 S.Ct. 1937.
At bottom, then, the problem with the supervisory liability claims here is that, like those at issue in Iqbal, they fail to cross “the line from conceivable to plausible.” Id. at 680, 129 S.Ct. 1937. As in Iqbal, the plaintiffs’ allegations here could be “consistent with” a scenario in which the supervisory officials somehow participated in their subordinates’ allegedly unconstitutional conduct. Id. at 678, 129 S.Ct. 1937. But the “obvious alternative explanation,” id. at 682, 129 S.Ct. 1937, for the supervisors’ conduct in assigning the case to certain investigators and attending meetings where the case was discussed is that they wanted to facilitate the investigation, stay abreast of recent developments, and bring the case to closure on a reasonable timeline. That, after all, is their job.
In short, the complaints here are wholly indiscriminate. They seek to sweep in everyone and everything, heedless of any actual indications of individual malfeasance that would justify the personal burdens that litigation can impose. What Iqbal condemned, the complaints assay. What is more, the complaints’ sweeping allegations mirror the sweeping nature of the wrongs of which plaintiffs complain. It is, of course, the purpose of civil litigation to rectify, but not in a manner that duplicates the very evils that prompted plaintiffs to file suit.
C.
The damage that the plaintiffs’ theory of the case would inflict upon the criminal justice system is evident in a related sense as well. The plaintiffs seek to hold the investigating officers and their supervisors liable by repeatedly asserting notions of conspiracy, suggesting that the defendants colluded to investigate and prosecute the Duke players despite the evidence of their innocence. The upshot of such a theory, however, would be that whenever police officers, their superiors, and prosecutors communicate regarding an investigation into certain suspects, that very act of communication would expose them to a risk of monetary liability should the suspects ultimately be exonerated. The plaintiffs’ theory of conspiracy, in other words, would inhibit the exchange of information among police and prosecutors that takes place every day. Thus, I could not agree more with Judge Motz’s statement that to allow § 1983 claims “to proceed on allegations of such a ‘conspiracy would in virtually every case render the officers’ qualified immunity from suit ‘effectively lost’ and make discovery the rule, rather than the exception.” Ante at 649.
The improvidence of subjecting law enforcement officers to such wide-ranging liability is supported by Supreme Court precedent in the analogous context of in-tra-enterprise antitrust conspiracy doctrine. As with the present case, that doctrine involves civil damages actions against related parties (for instance, a parent corporation and its wholly owned subsidiary) on the theory that wrongful conduct may be inferred from their intra-organizational communications. In Cop-perweld Corp. v. Independence Tube Corp., 467 U.S. 752, 777, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), however, the Court held that such parties cannot be held liable for “conspiring with each other” under Section 1 of the Sherman Act, 15 U.S.C. § 1. The Court recognized that coordination among various actors within a company is often “necessary if a business enterprise is to [operate] effectively,” but that such coordination might be discouraged if intraenterprise conspiracy liability were permitted. Id. at 769-71, 104 S.Ct. 2731. *663 That same concern animates our decision here. Moreover, Copperweld noted that “[coordination within a firm” is frequently the hallmark of a business’s commonplace desire to increase its effectiveness, and not necessarily a sign of some “effort to stifle competition.” Id. at 769, 104 S.Ct. 2731. That caution rings true here as well, where the mere fact that public officials meet to discuss a high-profile criminal case is far more often indicative of a desire to foster communication and cooperation than an insidious conspiracy to violate the Constitution.
D.
A final example of the overreach infecting this case lies in the Carrington and McFadyen plaintiffs’ attempts under Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to hold officers monetarily liable for seeking from the state courts a non-testimonial order and a search warrant for standard investigatory purposes.
Although Franks held that a warrant so grounded in falsehoods as to effectively eliminate its “support[] by Oath or affirmation” could give rise to a Fourth Amendment violation, id. at 164-65, 98 S.Ct. 2674, the Supreme Court stressed the importance of applying this rule so as not to vitiate the warrant process so instrumental to the personal privacy protected by our Bill of Rights. Indeed, in part because of concerns with the holding’s potential effects on the incentives of police, the Court emphasized that “the rule announced today has a limited scope.” Id. at 165-67, 98 S.Ct. 2674. And since Franks, the Court itself has never elucidated the standards for evaluating the veracity of affidavits supporting warrants. See Stephen W. Gard, Bearing False Witness: Perjured Affidavits and the Fourth Amendment, 41 Suffolk U.L. Rev. 445, 446 (2008).
In this area, therefore, we must heed the Supreme Court’s often communicated goal of preserving the warrant requirement. As one treatise explains:
The Supreme Court has long expressed a strong preference for the use of arrest warrants and search warrants. Resort to the warrant process, the Court has declared, is to be preferred because it “interposes an orderly procedure” involving “judicial impartiality,” United States v. Jeffers, 342 U.S. 48, 51 [72 S.Ct. 93, 96 L.Ed. 59] (1951), whereby “a neutral and detached magistrate,” Johnson v. United States, 333 U.S. 10, 14 [68 S.Ct. 367, 92 L.Ed. 436] (1948), can make “informed and deliberate determinations,” Aguilar v. Texas, 378 U.S. 108, 110 [84 S.Ct. 1509, 12 L.Ed.2d 723] (1964), on the issue of probable cause. To leave such decisions to the police is to allow “hurried actions,” id. at 110-11 [84 S.Ct. 1509], by those “engaged in the often competitive enterprise of ferreting out crime,” Johnson, 333 U.S. at 14, 68 S.Ct. 367.
Wayne R. LaFave, 2 Search and Seizure § 3.1(c) (4th ed. 2004). Because of this overarching concern, the Supreme Court has instructed lower courts to eschew rulings that would discourage resort to judicial process and instead incentivize the invocation of exceptions to the warrant requirement. As the Court declared in determining whether a warrant was supported by probable cause:
If the affidavits submitted by police officers are subjected to the type of scrutiny some courts have deemed appropriate, police might well resort to warrantless searches, with the hope of relying on consent or some other exception to the warrant clause that might develop at the time of the *664 search. In addition, the possession of a warrant by officers conducting an arrest or search greatly reduces the perception of unlawful or intrusive police conduct, by assuring the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search.
Illinois v. Gates, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (internal quotation marks omitted). This court has specifically acknowledged this admonition in declining to interpret the Franks rule in an overbroad manner. See United States v. Colkley, 899 F.2d 297, 303 (4th Cir.1990).
Moreover, the concern with establishing perverse incentives to circumvent the warrant process is all the more critical where an officer faces, as here, personal pecuniary loss in a civil claim for damages — as opposed to the exclusion of evidence in a criminal matter. In this regard, it bears note that Franks itself was an exclusionary rule case, and the Supreme Court has never provided guidance on whether and how the Franks rule should be implemented in the context of § 1983 claims. See Gard, supra, at 446 (“Th[e] absence of guidance [from the Supreme Court] for lower courts [with respect to the Franks rule generally] is especially acute because Franks predates both the Supreme Court’s revolutionary reinterpretation of the Fourth Amendment and the development of most modern civil rights law.”). Though this court has previously allowed such claims to proceed, see Miller v. Prince George’s Cnty., 475 F.3d 621, 627 (4th Cir.2007), we must step cautiously in light of the Supreme Court’s lack of direction in this area and its steadfast commitment to preserving the warrant requirement generally.
Plaintiff McFadyen’s Franks challenge to the search warrant for his room and car in connection with his utterly tasteless— indeed, ominous — e-mail stands on the shakiest of grounds. The potential for inflicting tremendous damage to the criminal justice system by punishing officers for pursuing a court-ordered NTO would be compounded by penalizing them for attempting to investigate what initially (and understandably) appeared to be an entirely credible threat to perpetrate a gruesome murder. To hold policemen liable for damages for a search even when they request and possess a warrant, even when they have uncovered an e-mail explicitly vowing to kill certain people out of apparent contempt for their class, and even where that e-mail identifies the exact location of the slaying would be outrageous.
The argument offered in the McFadyen complaint — that the investigators should have somehow realized that the e-mail was meant to be a joke or parody — is a theory that could succeed only in Never Never Land, a theory that takes no account of the real and brutal rampages by disturbed individuals on college campuses and elsewhere in recent years. As it turned out, the e-mail was a highly vulgarized expression of fancy. But we cannot ascribe instant clairvoyance to those charged with protecting the community — and who must be simultaneously encouraged to seek judicial sanction in doing so.
II.
It cannot be emphasized too often that the plaintiffs in this case were innocent of any criminal wrongdoing. Their behavior in many instances was boorish, but it was in no way illegal based on any evidence before us. The problem is that the immunities and rules of pleading at issue here exist to protect the larger good of discretionary judgment in the service of public purposes — and to prevent defendant officials who are innocent of any wrongdoing *665 from being swept up by baseless accusations in unrestrained complaints. The infirmities of the pleadings portended what was sure to become an extended fishing expedition, the broader implications of which could hardly be confined to these particular actions.
Hard cases can and do make bad law, and the costs of these ones — outside of the limited claim we have allowed to proceed— are much too steep. The plaintiffs seek to thrust the prospect of monetary liability and burdensome discovery into every meeting between supervisor and subordinate within a police department, every internal communication between police officer and prosecutor, every statement by a police spokesperson, and every effort to invoke judicial process in furtherance of a police investigation. Allowing these claims to proceed would let litigation loose in such a fashion as to impair the ability of the criminal justice system to do its job.
In sum, we run the risk here of replicating in civil litigation the very maladies that plaintiffs complain infected the criminal process to which they were subjected. That is to say, individuals would be pulled into the coercive proceedings of courts when they have no business being there. To prolong the overextension of legal process that has been attempted here would portend a sorry end to a sorry saga.
It is for this reason that I join the majority opinion in dismissing the complaints in large part, but preserving the state malicious prosecution claim against Gottlieb and Himan asserted by the Evans plaintiffs. The Evans plaintiffs were the only ones to raise a malicious prosecution claim under North Carolina law, and they were the only ones indicted. Given that the elements of the federal and North Carolina claims appear to differ, I agree with the court that the Evans plaintiffs have pled the state malicious prosecution claim with sufficient specificity to survive a motion to dismiss under the Iqbal standards governing even state claims brought in federal court. The Evans plaintiffs are the ones who have suffered the most harm, and their claim is the one most plausibly grounded in North Carolina law. That single claim with its two discrete defendants is where the case before us essentially stands now, and where it should have focused long, long ago.